**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|   |   |   |
|---|---|---|
| **SANDRA MADDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **20-10565-FDS** |
| | ) | |
| **ASCENSUS COLLEGE SAVINGS** | ) | |
| **RECORDKEEPING SERVICES, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

**MEMORANDUM AND ORDER ON**
**DEFENDANT'S MOTION TO DISMISS**

**SAYLOR, C.J.**

This is an action arising out of an employment termination. From April 2012 until June 2019, plaintiff Sandra Madden was senior vice president and general counsel at defendant Ascensus College Savings Recordkeeping Services, LLC. In June 2019, she was terminated. She has filed suit asserting various claims arising out of her employment and termination, including breach of contract, violation of the Equal Pay Act, and gender discrimination. Defendant has moved to dismiss three of those claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state claims upon which relief can be granted.

The motion to dismiss does not address the claims for violation of the Equal Pay Act or for gender discrimination. Instead, defendant seeks to dismiss the claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and defamation. Unfortunately, the complaint (and plaintiff's briefing) is a jumble of inconsistent and contradictory statements as to the nature of the alleged contract, making analysis of those issues somewhat complicated.

In any event, and for the reasons set forth below, the motion to dismiss will be granted in part and denied in part.

I.    **Background**

A.    **Factual Background**

The following facts are presented as alleged in the complaint unless otherwise noted.

Sandra Madden is a resident of Massachusetts.  (Compl. ¶ 1).

Ascensus College Savings Recordkeeping Services, LLC ("ACS") is a Delaware limited liability company.  (*Id.* ¶ 2).  ACS is a subsidiary of Ascensus Group, LLC.  (*Id.* ¶ 7).  Ascensus Group has two divisions:  Ascensus Government Savings and Ascensus Retirement.  (*Id.* ¶ 10). Ascensus Government Savings comprises ACS; Ascensus Broker Dealer Services, LLC; and Ascensus Investment Advisers, LLC.  (*Id.* ¶ 7).

Ascensus Government Savings provides "program management, recordkeeping, distribution and investment advisory services for various state administrators and business partners for state sponsored savings programs."  (*Id.* ¶ 12).  It is the "leading service provider in the 529 college savings account industry" and services "over $100 billion in assets."  (*Id.*).[1]  That portfolio represents "greater than a third of the 529 industry."  (*Id.*).

From April 2012 until June 2019, Madden was senior vice president and general counsel for Ascensus Government Savings.  (*Id.* ¶¶ 6-7).[2]  In that role, she oversaw a four- to six-person legal team.  (*Id.* ¶ 14).  That team was responsible for negotiating contracts, monitoring compliance and regulatory activities, creating disclosure documents, and supporting business and

---

[1] A 529 Plan, named after section 529 of the Internal Revenue Code, is a tax-advantaged college savings plan.

[2] The entities composing Ascensus Government Savings were owned by Sallie Mae until December 2013. (Compl. ¶¶ 6, 9).  That month, Ascensus Group acquired those entities and rebranded them as Ascensus Government Savings.  (*Id.* ¶ 9).

product development.  (*Id.*).  According to the complaint, during Madden's tenure as general counsel, she assisted in developing two new lines of business:  ABLE programs and state-sponsored retirement programs (SSRPs).  (*Id.* ¶ 13).[3]  Over the same period, Ascensus Government Savings doubled the assets of its 529 business.  (*Id.* ¶ 12).

The complaint alleges that Madden is "a leader in the 529/ABLE/SSRP industry."  (*Id.* ¶ 16).  She is one of twelve individuals nationwide selected to serve as a member of the Municipal Securities Rulemaking Board.  (*Id.*).  She is also an active member of the Transfer Agent Advisory Committee of the Investment Company Institute.  (*Id.*).  She has participated in the Legal Regulatory Committee and the Federal Initiatives Committee of the National Association of State Treasurers and the College Savings Plan Network.  (*Id.*).  She has provided testimony to the Treasury Department and drafted comment letters to regulators concerning the 529/ABLE/SSRP industry.  (*Id.*).

The complaint alleges in general terms that Madden's "employment with Defendant constituted a contractual relationship."  (*Id.* ¶ 56).  It does not allege, however, that there was a written employment contract, or a contract for a particular term.  Instead, it appears that Madden was an at-will employee.

In January 2016, "[i]n recognition of her successful management of business processes and leadership," ACS awarded Madden options to purchase common stock of its parent company.  (*Id.* ¶ 15).  The complaint does not indicate whether those options were vested when they were awarded, were to vest at some future time, or were to vest according to a specific schedule.

In spring 2018, Ascensus Group was reorganized.  (*Id.* ¶ 17).  As part of that

---

[3] An ABLE account is a tax-advantaged account for individuals with disabilities.

reorganization, Madden was instructed to begin reporting to Joseph Dansky, senior vice president and general counsel of Ascensus Retirement.  (*Id.*).  According to the complaint, prior to that reorganization, Dansky's responsibilities and experience centered on mergers and acquisitions; he had "no significant substantive experience working at regulated financial entities."  (*Id.* ¶¶ 18-19).

After the reorganization, Madden and her team were responsible for all of the legal work for Ascensus Group except for that related to mergers and acquisitions.  (*Id.* ¶ 30).  According to the complaint, despite that increased workload, Madden's staff did not increase in size.  (*Id.* ¶ 32).  She "questioned the appropriateness of the legal resources and the scope of legal services being contemplated for her group, in terms of the impact on compliance activities."  (*Id.* ¶ 31).  She also specifically requested that "she be provided additional staffing to replace an attorney that was spending greater than 90% of her time on non-[Ascensus Government Services] legal matters."  (*Id.* ¶ 34).

Dansky denied that request.  (*Id.*).  The complaint alleges that he told Madden that "she would not get any further resources" and that "she should stop asking" and "stop providing him with status reports of the legal workload for [Ascensus Government Services]."  (*Id.* ¶ 32).

According to the complaint, Madden also received "numerous complaints" from Ascensus Group employees concerning the work product and demeanor of an attorney who reported to Dansky.  (*Id.* ¶ 37).  She raised those concerns with Dansky, who told her "numerous times that he had never received negative feedback" about that attorney.  (*Id.* ¶ 38).  He also allegedly ignored the recommendation of Madden and the president of Ascensus Government Services concerning the hiring decision for the chief compliance officer for that division.  (*Id.* ¶ 35).

The complaint alleges that Dansky "repeatedly showed little knowledge of or interest in pertinent securities regulations."  (*Id.* ¶ 26).  For example, he allegedly proposed that ACS ignore "the securities regulatory requirement to obtain consent from the clients of the investment management contracts of a company that [ACS] was considering purchasing."  (*Id.*).  Madden and the chief compliance officer objected to that proposal, "citing the potential risks to the company for knowingly violating a securities regulation," but Dansky "ignored their objections." (*Id.* ¶ 27).

Dansky is also alleged to have "erroneously filed certain privacy incidents as breaches with several state attorney generals" based on an "improper legal analysis."  (*Id.* ¶ 28).  As a result of those filings, certain ACS employees were terminated, even though "the incidents were not actually breaches and did not need to be filed with state authorities."  (*Id.*).  When Madden informed Dansky that the privacy incidents were incorrectly handled, he did not correct the filings or investigate whether any personnel files included inaccuracies based on them.  (*Id.* ¶ 29).

The complaint alleges that because Madden "repeatedly expressed concerns about regulatory risk and compliance risk" at ACS, Dansky "engaged in a pattern of retaliation" against her.  (*Id.* ¶ 40).  He informed her that she "would not be getting any additional resources" and that "he did not view her as a leader."  (*Id.* ¶ 39).

The complaint further alleges that Madden was "consistently treated less favorably than her male co-workers."  (*Id.* ¶ 42).  It specifically alleges that she was paid less and received less generous equity awards than male colleagues.  (*Id.* ¶ 43).  She also did not receive additional resources to handle increased workloads, even though her male colleagues did.  (*Id.* ¶ 44).  And she was not invited to executive meetings and management trainings to which her male

colleagues were invited.  (*Id.* ¶¶ 45-46).

In March 2019, Madden received her first annual performance review from Dansky.  (*Id.* ¶ 41).  That review was her first performance review to include any negative comments.  (*Id.*).  According to the complaint, it contained "false statements" and "criticism of incidents taken out of context."  (*Id.*).

On June 19, 2019, Madden was told that "her position was being eliminated immediately."  (*Id.* ¶ 47).  That same day, her e-mail access was revoked, and she was "walked out" of ACS (that is, escorted from the building).  (*Id.* ¶ 50).  According to the complaint, the fact that an executive at ACS was walked out upon termination is unusual:  there had never been a senior vice president or vice president at ACS who had been walked out upon termination.  (*Id.* ¶ 51).  And two male executives who recently had been terminated were provided several months' notice and allowed to seek new positions using their company e-mail addresses while employed.  (*Id.* ¶ 52).

The method of Madden's termination "hampered" her ability to seek new employment.  (*Id.* ¶ 53).  Specifically, the complaint alleges that she had difficulty "connecting with business contacts" and "staying informed of meetings for the various boards of which she is a member." (*Id.*).  And since her termination, ACS has "not provided any payment or documentation of the stock options [Madden] exercised."  (*Id.* ¶ 54).

**B.     Procedural Background**

On March 20, 2020, Madden sued ACS.  The complaint asserts five claims:  breach of contract (Count 1); violation of the Equal Pay Act, 29 U.S.C. § 203 (Count 2); gender discrimination in violation of Title VII, 42 U.S.C. § 2000e-2, and Mass. Gen. Laws ch. 151B (Count 3); breach of the implied covenant of good faith and fair dealing (Count 4); and defamation (Count 5).  ACS has moved to dismiss Count 1, Count 4, and Count 5 pursuant to

Fed. R. Civ. P. 12(b)(6) for failure to state claims upon which relief can be granted.

## II.   Legal Standard

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). In determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

## III.   Analysis

### A.   Count 1:  Breach of Contract

Under Massachusetts law, to assert a claim for breach of contract, the complaint must allege that (1) a valid contract between the parties existed; (2) the plaintiff was ready, willing, and able to perform; (3) the defendant breached that contract; and (4) the defendant's breach caused the plaintiff damage. *See Netcracker Tech. Corp. v. Laliberté*, 2020 WL 6384312, at *5 (D. Mass. Oct. 30, 2020) (citing *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013)). The elements of a valid contract include an offer, an acceptance, and an exchange of consideration. *See Harbi v. Massachusetts Inst. of Tech.*, 2017 WL 3841483, at *7 (D. Mass. Sept. 1, 2017)

7

(citing *Vadnais v. NSK Steering Sys. Am., Inc.*, 675 F. Supp. 2d 205, 207 (D. Mass. 2009)).

For a breach-of-contract claim to survive a motion to dismiss, the complaint "must do more than allege, in a conclusory fashion, that the defendant breached the contract."  *Hogan v. Teamsters Local 170*, 2020 WL 5821905, at *3 (D. Mass. Sept. 30, 2020) (quoting *Alenci v. Hometown Am. Mgt., LLC*, 2020 WL 2515872, at *4 (D. Mass. May 15, 2020)).  Instead, it must allege, with "substantial certainty," the specific contractual obligation that the defendant breached.  *Id.* (quoting *Alenci*, 2020 WL 2515872, at *4); *see also Buck v. American Airlines, Inc.*, 476 F.3d 29, 38 (1st Cir. 2007) (describing the pleading requirement for breach-of-contract claims under Massachusetts law).  In particular, it must "at least" plead facts that identify "who did what to whom, when, where, and why," and explain "what obligations were imposed on each of the parties by the alleged contract."  *Hogan*, 2020 WL 5821905, at *3 (quoting *Alenci*, 2020 WL 2515872, at *4).

The actual alleged contract at issue in this case is a matter of substantial confusion.  The allegations in the complaint as to the existence of a contract, and its breach, are as follows:

> 56.    Ms. Madden's employment with Defendant constituted a contractual relationship.
>
> 57.    Ms. Madden met all her obligations to Defendant by performing her duties diligently and competently.
>
> 58.    Defendant breached the contract of employment by terminating Ms. Madden in retaliation for her raising concerns about the company's regulatory compliance.
>
> 59.    Defendant breached its contract with Ms. Madden by not providing any payment or documentation of the stock options Ms. Madden exercised.
>
> 60.    As a direct and proximate result of Defendant's breach of contract, Ms. Madden has suffered damages, including lost wages, lost benefits, and an unpaid bonus for 2019.

(Compl. ¶¶ 56-60).

### 1.    <u>Employment Contract Generally</u>

The allegations of the complaint, taken as a whole, suggest that plaintiff is alleging the existence of an employment contract that has at least two specific provisions:  prohibiting termination in retaliation for certain conduct and requiring payment and documentation upon the exercise of stock options.  But there are no further allegations concerning the existence of such an employment contract or its terms, such as the date any contract was executed, the parties to the contract, what obligations it imposed, the length of the contract, and whether it was reduced to writing.  Furthermore, plaintiff has neither quoted the language of any such contract nor attached it as an exhibit to the complaint.

Instead, the complaint simply alleges that plaintiff's "employment with [defendant] constituted a contractual relationship."  (*Id.* ¶ 56).  That conclusory allegation, without more, is insufficient to allege the existence of an enforceable contract.  *See Driscoll v. Simsbury Assocs., Inc.*, 2018 WL 2139223, at *5 (D. Mass. May 9, 2018) ("To the extent that Plaintiff is attempting to argue that a contract existed simply by virtue of her employment, she has cited no legal authority in support of that proposition.").  Without explaining "what obligations were imposed on each of the parties by the alleged contract," the complaint falls far short of the "irreducible minimum" required to plead a claim for breach of contract.  *See Buck*, 476 F.3d at 38; *Hogan*, 2020 WL 5821905, at *3 (explaining that the complaint must "at least" identify "what obligations were imposed on each of the parties by the alleged contract" and describe with "substantial certainty the specific contractual promise the defendant failed to keep" (internal quotation marks and citations omitted)).[4]

---

[4] In her opposition, plaintiff does not even argue that the complaint alleges an employment contract.  (Pl. Opp. at 5-6).  Instead, she contends that the complaint properly pleads a claim for breach of contract because "every

Accordingly, to the extent that the complaint alleges the existence and breach of an employment contract, it fails to state a claim upon which relief can be granted. *See Higgins v. Town of Concord*, 246 F. Supp. 3d 502, 518 (D. Mass. 2017) (granting motion to dismiss breach-of-contract claim where the complaint "fails to identify what 'contract' is at issue," making the claim "too vague and imprecise to provide meaningful guidance to the defendants").

2.      **Contract Concerning Stock Options**

Notwithstanding the allegations in the complaint, plaintiff herself now rejects defendant's characterization of the alleged contract as an employment contract, contending instead that it is a contract concerning stock options and nothing more:

> Defendant seeks to have Count 1 dismissed by erroneously claiming that [plaintiff] failed to establish "the existence of an employment contract or otherwise demonstrating the provisions of such contract which were purportedly breached." However, the focus of the breach of contract claim is that Ascensus has not provided any payment or documentation of the stock options [plaintiff] exercised.

(Pl. Opp. at 6 (internal citation omitted) (quoting Def. Mem. at 7)). She likewise contends in her opposition that the complaint "plainly alleges *the existence of a contract between herself and [defendant] for stock options*, which were first offered in 2016." (*Id.* (emphasis added)).

It thus appears that plaintiff intended to allege merely the existence and breach of a contract concerning her stock options. If so, it is unclear whether the other allegations concerning a "contract of employment" and its breach are mere surplusage and may be disregarded. Nor is it clear how a failure to provide payment or documentation upon the exercise of stock options could result, as the complaint alleges, in contractual damages such as lost wages,

---

contract contains a covenant of good faith and fair dealing, and an employer breaches that covenant when it dismisses an at-will employee in order to deprive her of compensation fairly earned and legitimately expected for services rendered." (*Id.*). But that argument simply assumes the existence of a contract, which is a disputed issue; a valid contract is a necessary predicate to a claim for breach of the implied covenant of good faith and fair dealing.

lost benefits, and an unpaid bonus.

In any event, the question is whether the complaint sets forth sufficiently specific allegations as to the existence of a contract for stock options.  As noted, it alleges that "[i]n recognition of her successful management of business processes and leadership, in January 2016 [defendant] awarded [plaintiff] 190.51 stock options to purchase common stock" of defendant's parent company.  (Compl. ¶ 15).  It also alleges that defendant "breached its contract with [plaintiff] by not providing any payment or documentation of the stock options [she] exercised." (*Id.* ¶ 59; *see also id.* ¶ 54 ("[Defendant] has not provided any payment or documentation of the stock options [plaintiff] exercised.")).  It thus appears that plaintiff exercised, or attempted to exercise, some or all of her options, and did not receive any payment or "documentation" as a result.

There is nothing else in the complaint about the alleged options contract, or the obligations of either party, including whether the options had vested, in whole or in part, at the time she exercised (or attempted to exercise) them.  It does not allege what, if any, obligations were created concerning providing "documentation."  It does not allege when the contract was created, or whether it was oral or written.  If there is a written contract, it is not described or quoted, and it is not attached to the complaint.  Nor are there any specifics as to the alleged breach, such as when she exercised or attempted to exercise the options, and what happened as a result.  The complaint is therefore missing the most basic information as to the terms of the alleged contract and the nature of the breach.  *See Buck*, 476 F.3d at 38; *Hogan*, 2020 WL 5821905, at *3.

Her opposition to the motion to dismiss adds a few sketchy details.  She argues in her memorandum that the contract for stock options "included a proposed schedule for when her

11

interests would vest and how she could exercise those options," and that "[t]he obligations imposed on each party by this contract were unequivocal."  (Pl. Opp. at 6).  That, too, is unduly vague; she never explains what those "unequivocal" obligations actually are, or how they were breached.  Nor does she indicate whether the "proposed" vesting schedule actually created any contractual rights, and if so, what those rights were.  More importantly, those allegations are not in the complaint, and may not be used to bolster its claims.  *See Driscoll*, 2018 WL 2139223, at *5 n.3 (explaining that a plaintiff "may not amend her complaint through her opposition brief").

Again, a claim for breach of contract must set forth basic information as to the nature and terms of the alleged contract and the circumstances of the alleged breach.  Here, the allegations in the complaint as to the existence of a contract concerning the exercise of stock options, and defendant's breach of that contract, are wholly inadequate to satisfy those requirements.  The motion to dismiss will therefore be granted as to that claim.

\*     \*     \*

The fundamental purpose of a complaint is to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  It may be, of course, that plaintiff has a valid factual basis for a claim for breach of contract.  But that does not mean she is not required to provide the defendant with notice of the basis of that claim.  Because she has failed to do so, her claim for breach of contract fails, and the Court will grant defendant's motion to dismiss as to Count 1.

### B.  <u>Count 4:  Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.  *See UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).  That covenant provides that "neither party shall do anything that will have the effect of

destroying or injuring the rights of the other party to receive the fruits of the contract."

*Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471-72 (1991) (quoting *Drucker v.*

*Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976)).  By contracting, parties implicitly agree

"to deal honestly and in good faith in both the performance and enforcement of the terms of their

contract."  *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 211 (1993).  To establish

a breach of the implied covenant, "a plaintiff must prove that there existed an enforceable

contract between the two parties and that the defendant did something that had the effect of

destroying or injuring the right of [the plaintiff] to receive the fruits of the contract."

*FabriClear, LLC v. Harvest Direct, LLC*, 2020 WL 4938340, at *5 (D. Mass. Aug. 24, 2020)

(quoting *Blake v. Professional Coin Grading Serv.*, 898 F. Supp. 2d 365, 388 (D. Mass. 2012)).

      Here, the basis for plaintiff's claim is again unclear.  The complaint alleges that

defendant breached the implied covenant when it terminated plaintiff contrary to public policy.

(Compl. ¶¶ 73-76).  Specifically, it alleges that defendant terminated plaintiff "to cover up its

potentially illegal conduct" after she "raised concerns of [defendant's] potential violations of

federal securities regulations in good faith."  (*Id.* ¶¶ 74-75).  And in her opposition

memorandum, plaintiff contends that Count 4 should survive the motion to dismiss by relying on

case law concerning terminations in violation of public policy.  (Pl. Opp. at 7-9).  At the same

time, elsewhere in her opposition, plaintiff contends that defendant breached the implied

covenant of good faith and fair dealing by terminating plaintiff to deprive her of compensation—

the stock options—that she earned.  (*Id.* at 5-6).  She makes that contention, however, only in her

opposition; it is absent from her complaint.

      In any event, plaintiff's claim for breach of the implied covenant fails for the same reason

her claim for breach of contract fails:  the complaint does not properly allege the existence of a

contract.  "Under Massachusetts law, a claim of breach of the implied covenant of good faith and fair dealing can lie only where there exists a binding contract."  *Haglund v. Estée Lauder Cos.*, 466 F. Supp. 3d 292, 300 (D. Mass. 2020) (citing *Eigerman v. Putnam Invs., Inc.*, 450 Mass. 281, 288 (2007)); *see also Driscoll*, 2018 WL 2139223, at *5 n.3 ("[T]he claim [for breach of the implied covenant of good faith and fair dealing] would fail because [the plaintiff] has not sufficiently alleged the existence of a contract." (citing *Human Res. Dev. Press, Inc. v. Ikon Office Sols. Co.*, 2006 WL 149043, at *9 (D. Mass. Jan. 12, 2006))).  Because the Court concluded that the complaint does not sufficiently allege any contract between plaintiff and defendant, plaintiff may not maintain a claim for breach of the implied covenant.  *See Haglund*, 466 F. Supp. 3d at 300 ("Having concluded that no contract between the parties exists, plaintiff cannot maintain a derivative claim for violation of the implied covenant of good faith and fair dealing.").

The fact that plaintiff may not maintain a claim for breach of the implied covenant of good faith and fair dealing in the absence of a contract does not mean that defendant's ability to terminate plaintiff was unrestrained.  It is well-established under Massachusetts law that an employer may not terminate an employee in violation of "clearly established public policy."  *Limoli v. Delta Air Lines, Inc.*, 2019 WL 6253269, at *9 (D. Mass. Nov. 22, 2019) (quoting *King v. Driscoll*, 418 Mass. 576, 582 (1994)).  To the extent that the complaint's allegations that plaintiff's termination violated public policy have merit, they may support a claim for wrongful termination.  But the complaint does not assert such a claim.  Instead, it asserts a claim for breach of the implied covenant, which requires a contract between the parties.  *See, e.g.*, *Haglund*, 466 F. Supp. 3d at 300; *Driscoll*, 2018 WL 2139223, at *5 n.3.

Accordingly, the Court will grant defendant's motion to dismiss as to Count 4.

14

C.    **Count 5:  Defamation**

Under Massachusetts law, to assert a claim for defamation, the complaint must allege that (1) the defendant made a statement concerning the plaintiff to a third party; (2) the statement was defamatory such that it could damage the plaintiff's reputation in the community; (3) the defendant was at fault in making the statement; and (4) the statement either caused the plaintiff economic loss or is actionable without proof of economic loss. *See Shay v. Walters*, 702 F.3d 76, 81 (1st Cir. 2012) (citing *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-30 (2003)).  A statement is "susceptible to defamatory meaning" if it tends "to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community." *Id.* (quoting *Amtrak Prods., Inc. v. Morton*, 410 F.3d 69, 72 (1st Cir. 2005)).

Defamation is not limited to written and oral statements; conduct may be defamatory if "a reasonable third person observing [the defendant's] conduct would have understood it to be defamatory." *Phelan v. May Dep't Stores Co.*, 443 Mass. 52, 58 (2004); *see also id.* at 57 ("[D]efamatory publication may result from the physical actions of a defendant, in the absence of written or spoken communication." (emphasis omitted)); *Craig v. Merrimack Valley Hosp.*, 45 F. Supp. 3d 137, 153 (D. Mass. 2014) ("Defamation by conduct is a recognized cause of action in Massachusetts.").

The complaint alleges that defendant's conduct upon terminating plaintiff was defamatory.  (Compl. ¶¶ 78-81).  Specifically, it alleges that defendant's escorting her out of ACS in view of her co-workers and suspending her e-mail access constituted defamatory conduct.  (*Id.* ¶ 78).  It further alleges that the conduct was a "false statement" that "suggest[ed] that [plaintiff] had engaged in criminal activity" and "discredited her in a respectable class of the community."  (*Id.* ¶¶ 79-80).

Defendant contends, in substance, that the complaint fails to allege the first two elements

of defamation—that the defendant made a statement concerning the plaintiff and that the statement was defamatory.[5]  Defendant first contends that the complaint fails to allege that it made any "statement" because "[i]t is well established that conduct alone is insufficient to support a defamation claim."  (Def. Mem. at 11-13).  But that is incorrect.  Under Massachusetts law, conduct alone may support a defamation claim.  *See, e.g.*, *Phelan*, 443 Mass. at 57-58; *Craig*, 45 F. Supp. 3d at 153.

Defendant further contends that the specific conduct the complaint alleges—that defendant escorted plaintiff from the premises after her termination—is not defamatory as a matter of law.  Defendant reasons that in each of the three decisions on which plaintiff relies, "the court required more than the mere act of escorting an individual from the premises to advance a defamation claim."  (Def. Reply at 9-10 (citing *Petsch-Schmid v. Boston Edison Co.*, 914 F. Supp. 697 (D. Mass. 1996); *Phelan*, 443 Mass. at 52; *Lopez v. Massachusetts Gen. Hosp.*, 2017 WL 2562429 (Mass. App. Ct. June 14, 2017) (unpublished))).  And defendant notes that a recent decision by this court "reaffirmed that merely walking someone out of a building, without doing anything more to convey a defamatory message, as a matter of law is not defamation."  (*Id.* at 10 (citing *Cloutier v. City of Lowell*, 2017 WL 11488633 (D. Mass. July 12, 2017))).

Those decisions, however, do not examine whether claims could survive motions to dismiss.  In *Cloutier* and *Lopez*, the courts granted the defendants' motions for summary judgment as to defamation claims because the plaintiffs failed to present evidence that third parties would have understood defendants' conduct—escorting the plaintiffs out of the

---

[5] The complaint sufficiently alleges the third and fourth elements of defamation, and defendants do not contend otherwise.  It plainly alleges that defendant is at fault.  (Compl. ¶¶ 78-80).  And not only does the complaint allege that the statement caused economic loss (*id.* ¶ 81), but the statement is actionable even without such a loss because it is a statement that "may prejudice the plaintiff's profession or business."  *Ravnikar*, 438 Mass. at 630 (citing *Lynch v. Lyons*, 303 Mass. 116, 118-19 (1939)).

16

premises—to be defamatory.  *See Cloutier*, 2017 WL 11488633, at *32 ("Even viewing the evidence in the light most favorable to plaintiff, defendants' conduct—walking out of the library with plaintiff—is ambiguous and open to various interpretations.  Plaintiff's mere belief that defendants' actions damaged her reputation, without more, is insufficient to create a material issue that defendants' conduct was defamatory." (internal quotation marks and citation omitted)); *Lopez*, 2017 WL 2562429, at *4 ("[Plaintiff] also argues that [defendant's] actions constituted defamation by conduct because its security guards escorted her from MGH.  [Plaintiff] has not demonstrated a dispute of material fact on this claim." (citing *Phelan*, 443 Mass. at 58-59)).

In *Phelan*, the SJC affirmed a judgment notwithstanding the verdict in defendant's favor for the same reason.  *See Phelan*, 443 Mass. at 58-59 ("To satisfy his burden of proof, [plaintiff] needed to present testimony from at least one coworker who observed [the employer's] actions and interpreted such actions as defamatory.  Because he failed to do so, we conclude that he did not establish the essential elements of defamation." (internal citation omitted)).  As in *Cloutier* and *Lopez*, judgment in favor of the defendant was appropriate because the plaintiff failed to present evidence that the defendant's conduct was defamatory.

And in *Petsch-Schmid*, the court denied the defendant's motion for summary judgment as to the plaintiff's defamation claim.  *See Petsch-Schmid*, 914 F. Supp. at 705-06.  That decision followed the court's previous decision in the case denying the defendant's motion for judgment on the pleadings as to the same claim.  *See id.* at 705.  In the decision denying the motion for judgment on the pleadings, the court explained that "it is possible that the escort may have been conducted in such a manner as to communicate a defamatory statement to other employees about the plaintiff."  *Id.*  Even though the court recognized that the plaintiff "may have difficulty in proving this claim," it nevertheless permitted the claim to go forward.  *Id.*

17

For present purposes, the complaint need only allege a plausible claim that third parties would have reasonably understood defendant's conduct to be defamatory.  Here, the complaint includes the following allegations:

- "In the financial services industry if the general counsel is walked out with no transition this creates the impression of wrongdoing on the part of the general counsel."  (Compl. ¶ 50).

- "Upon information and belief, there has never been a Senior Vice President or Vice President at [ACS] who has been walked out upon termination."  (*Id.* ¶ 51).

- "[Plaintiff's] termination was in stark contrast to that of two male executives who had recently been terminated.  Both had been given notice months in advance of their ultimate termination date and had been allowed to openly seek new positions while still employed, which included access to their company email."  (*Id.* ¶ 52).

Under the circumstances, the claim for defamation is sufficiently plausible to survive a motion to dismiss.  Whether it will survive summary judgment is a question for another day.  Accordingly, the Court will deny the motion to dismiss as to Count 5.

## IV.    Conclusion

For the foregoing reasons, defendant's motion to dismiss is GRANTED as to Count 1 and Count 4 and otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Dated:  January 22, 2021                   Chief Judge, United States District Court